UNITED STATES v. FLINT & P. M. RY. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. July 5, 1899.)

No. 582.

1. PUBLIC LANDS—FORFEITURE OF RAILROAD GRANT—BONA FIDE PURCHASERS.
The effect of the acts of March 3, 1887 (24 Stat. 556), and of March 2, 1896 (29 Stat. 42), providing for the adjustment of railroad land grants, was to confirm in bona fide purchasers from a railroad company the title to lands which, when certified under the grant, were public lands of the United States, and not subject to individual claims, although at the time the grant attached they had been withdrawn from its operation, where they were subsequently restored to the public domain, were within the limits of the grant, and were earned by the company.

2. SAME—WHO ARE BONA FIDE PURCHASERS—EFFECT OF SALE IN FORECLOSURE.
Where a railroad company to which a land grant was made, and to which lands were certified thereunder as earned, conveyed the legal title to such lands in trust for its bondholders, and on the foreclosure of a subsequent mortgage its equity of redemption was sold, leaving the title in the trustees, and subject to the rights of the first bondholders, such sale operated to extinguish all title and interest of the original grantee in the lands, and took the trustees out of the proviso of the act of March 3, 1887 (24 Stat. 556), excepting mortgagees from the provision in favor of bona fide purchasers, and the trustees and purchaser of the equity of redemption became bona fide purchasers, within the meaning of such provision and of section 1 of the act of March 2, 1896 (29 Stat. 42).

3. MORTGAGES—CONVEYANCE OF EQUITY OF REDEMPTION TO MORTGAGEE—CONSIDERATION.
A deed made by a railroad company to trustees, to whom it had previously conveyed the legal title to lands to secure its bonds, purporting to convey to such trustees the equity of redemption for the benefit of the

bondholders, but for which no consideration was received, is ineffectual to devest the company of such equity.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

This was a bill in equity filed by the United States in the circuit court for the Eastern district of Michigan, under authority of Act Cong. March 3, 1887, c. 376 (24 Stat. 556), providing for the adjustment of land grants made by congress to aid in the construction of railroads. The lands in controversy were situate in the county of Isabella, state of Michigan, and had an area of 21,751 acres. The bill charged that the lands had been wrongfully certified to the state of Michigan for the benefit of the defendant company, and the prayer was for the cancellation of such certification, and the restoration of the lands to the public domain. The bill was filed against the Flint & Pere Marquette Railway Company, and the Flint & Pere Marquette Railroad Company, W. W. Crapo, trustee, and a large number of individual defendants. The individual defendants were averred to be in possession of different parcels of the land under grants from the Flint & Pere Marquette Railway Company or its trustees. The circuit court, after a final hearing upon issues made by answers and replication and evidence, entered a decree dismissing the bill as to all of the defendants. An appeal has been taken from the decree in so far as it dismissed the bill as to 720 acres of land, the title to which stands now in the name of William W. Crapo, trustee, to whom it was conveyed by the Flint & Pere Marquette Railway Company.

By the act of congress of June 3, 1856 (11 Stat. 21), a grant of land was made in the state of Michigan to aid in the construction of certain railroads, of which one was from Pere Marquette to Flint. The grant was of every alternate section of land designated by odd numbers for six sections in width on each side of each of said railroads. And it was provided that if, when the lines of the roads were definitely fixed, it appeared that the United States had sold such sections, or parts thereof, or the right of pre-emption had attached to the same, an agent appointed by the governor of the state might select, subject to the approval of the secretary of the interior, other sections within 15 miles of the lines of the road which should be held by the state for the purpose of the grant. Lands theretofore reserved by the United States by act of congress, or in any other manner by competent authority, for the purpose of aiding in the object of any internal improvement, or for any other purpose whatever, were reserved from the operation of the act. Lands granted to the state by the act were made subject to disposal by the legislature for the purposes of the act. The manner of disposition by the state was prescribed as follows: "That a quantity of land not exceeding one hundred and twenty sections for each of said roads, and included within a continuous length of twenty miles of each of said roads, may be sold, and when the governor of said state shall certify to the secretary of the interior that any twenty continuous miles of any of said roads is completed, then another quantity of land hereby granted, not to exceed one hundred and twenty sections for each of said roads having twenty continuous miles completed as aforesaid, and included within a continuous length of twenty miles of each of said roads, may be sold, and so, from time to time, until said roads are completed." The legislature of the state of Michigan, by act of 1857 (Laws Mich. 1857, p. 346), conferred the grant of lands made to the state for the construction of the road from Pere Marquette to Flint upon the Flint & Pere Marquette Railway Company. By section 7 of this act, as amended in 1859 (Laws Mich. 1859, p. 442), and in accordance with the authority given by the act of congress of June 3, 1856, upon the completion of each 20 miles of railroad, and after the certificate by the governor and the secretary of the interior of such completion, the railway company was authorized to sell the 120 sections of land earned, and so on until the whole of its road was completed; and on the final completion of the entire road it was authorized to sell the remainder of the lands. The grant was accepted by the Flint & Pere Marquette Railway Company, which filed its map of definite location. approved by the governor of the state of Michigan, with the commissioner of the general land office on August 18, 1857, and thereafter proceeded to construct and complete its road from Pere Marquette to

Flint within the time limited by the act. As the construction progressed, the governor of Michigan then in office certified to the secretary of the interior the completion of the road, and the secretary of the interior certified the lands to the railway company. The total area of the land which the railway company would have received for the whole length of the road from Pere Marquette to Flint, if the land had been available within the 15-mile limit, was 586,828 acres. The amount of land certified within the 6-mile limit was 258,947 acres. The deficiency lands certified within the 15-mile limit amounted in area to 252,478 acres; making a total of lands actually certified to the railway company of 511,425 acres. This left a deficiency of 75,402 acres in the grant to the railway company. Of the lands so certified, 21,751 acres are the lands described in the bill. They are situate in the county of Isabella, and were within the 6-mile limit of the railroad. They were certified by the commissioner of the land office under date of September 24, 1862, and approved by the secretary of the interior, December 1, 1862. As already said, of the 21,751 acres, but 720 acres are involved in this appeal.

The averment of the bill was, and the claim on behalf of the appellant is, that the lands in controversy did not pass by the congressional grant, but were excepted therefrom by reservation for other purposes before and at the time of the grant. This claim rests on the following facts: By letter of December 20, 1854, the commissioner of the land office recommended to the secretary of the interior that the lands in Isabella county be withdrawn from the market, and be reserved for Indian purposes, or so much thereof as might be deemed expedient. The secretary of the interior, by letter of April 12, 1855, referring to the foregoing, recommended to the president the withdrawal of the lands "with the express understanding that no peculiar or exclusive claim to any of the land so withdrawn can be acquired by said Indians, for whose future benefit it is understood to be made, until after they shall, by future legislation, be invested with the legal title thereto." On May 14, 1855, the withdrawal was made by the president in the following words:

"Let the withdrawal of all vacant land in Isabella county be made with the express understanding contained in the letter of the secretary of the interior to me of the 12th inst.                          Franklin Pierce."

The secretary of the interior advised the commissioner of the land office of this action of the president by a letter of the same date. On August 2, 1855, a treaty was made with the Chippewa Indians, in which it was stipulated that the United States should withdraw from sale, for the benefit of the Indians, all the unsold public lands in the state of Michigan, among which were embraced "six adjoining townships of land of the county of Isabella, to be selected by said Indians within three months of this date and notice thereof given to their agent." By letter of May 30, 1856, the land commissioner accordingly directed the suspension of sales and location of lands in Isabella county. The railroad company filed its map of definite location on August 18, 1857. After considerable correspondence between the railroad company's agent and the land department, the commissioner of Indian affairs, in 1859, reported the selection of six townships under the treaty of the Indians, specifying the townships, which did not include the lands here in controversy. In 1861 the remainder of the lands in Isabella county were restored to the market for sale. The question was then mooted whether the Flint & Pere Marquette Railway Company was entitled to take the lands within the six-mile limit in Isabella township which had thus been reserved for selection by the Indians, and not used for that purpose. The secretary of the interior distinctly decided that the lands in controversy were lands which, under the grant of June 3, 1856, passed to the state of Michigan to aid in the construction of the road from Pere Marquette to Flint. This decision was rendered in 1861. The lands in controversy were certified to the railway company as lands granted to the state of Michigan, under act of congress of June 3, 1856, by the commissioner of the general land office, on September 22, 1862, and this certification was approved December 1, 1862, by the secretary of the interior.

The history of the title to the lands in question after the certification is as follows: On April 6, 1860, the Flint & Pere Marquette Railway Company executed a deed of trust to Clark, Knapp, and Edmunds, trustees, of the first 40 miles of the railroad running from Flint to Marquette, and 153,360 acres of

land earned by said construction, to secure the payment of $480,000 of bonds. The trustees were authorized to sell the lands, and apply the proceeds to the payment of the bonds. On September 25, 1866, the railway company executed another deed to Tucker, Prescott, and Knapp, trustees, conveying the first 60 miles of road and 153,600 acres of land,—being the land to which the company would be entitled upon the construction of the second and third divisions of 20 miles,—to secure $500,000 of bonds. On August 2, 1875, the railway company, to secure the payment of $378,500 of bonds known as the "Flint and Holly Bonds," and $800,000 of bonds known as "Consolidated Bonds," which were then outstanding, and for which the railway company was liable to the holders, conveyed to Tucker, Prescott, and Crapo all the lands embraced in the first two deeds, and not disposed of by sale, subject to the trusts of the first two deeds. The trustees were authorized to sell the land, and apply the proceeds to the payment of bonds. By death and other changes the title to the land in the foregoing deeds became vested in Prescott and Crapo, as trustees, and on the 23d of August, 1879, the railway company conveyed to Prescott and Crapo all the right, title, and interest and equity of redemption of the Flint & Pere Marquette Railway Company in and to all the lands which were embraced in the grant of lands in said railway company under act of congress, including the lands unsold and the land contracts for lands which were within said grant which had then been sold, or on which partial payments had been made, and the moneys due and to grow due on said land contracts, and all securities for the payment of the same, and reciting that the indebtedness secured was greater than the value, thereby purported to vest in Prescott and Crapo the absolute title and equity of redemption of the Flint & Pere Marquette Railway Company in all of said lands. The conveyance was in trust to Prescott and Crapo to carry out the trusts expressed in three previous deeds of trust. Prescott died in 1890, and the trust survived in Crapo. Under the three deeds of trust made in 1860, 1866, and 1875, conveyances of lands made by the trustees under the several deeds were joined in by the railway company. But after the deed of 1879 the trustees made sales of land in their own name, without joining the railway company as a grantor. The sales were, however, made as the property of the railway company, were advertised as such, and were sold at their full value. Since 1873 the trustees have paid taxes upon the lands unsold down to the date of the filing of the bill. On the 20th of June, 1879, the trustees under the trust deed or mortgage of 1872 securing the consolidated bonds filed a bill in the United States circuit court for the Eastern district of Michigan to foreclose the same. On the 21st of August, 1879, a supplemental bill was filed to foreclose an additional mortgage to secure the same bonds, which covered all the property of the Flint & Pere Marquette Company of every kind, including its interest in the lands in question. The receiver was appointed under the original bill, and continued to act under the supplemental bill; but the lands in controversy, being held by trustees, did not pass into the custody or control of the receiver. On June 12, 1880, a decree was passed in the suit, by which all the property rights and franchises of the Flint & Pere Marquette Company were decreed to be sold subject to the lien created by the earlier trust deeds heretofore recited. The bonds of the consolidated mortgage, amounting to $6,236,368, principal and interest, were declared to be a lien upon the entire property rights and franchises of the Flint & Pere Marquette Railway Company subject to the prior liens already mentioned. The decree contained the following clause:

"Fourth. That said complainants, Crapo, Pierce, and Rogers, as trustees, and representing the holders of the said consolidated bonds, are entitled to have all the lands and land assets (being the lands which were embraced in the land grant as stated in the pleadings) and moneys on hand, or that may be realized from lands heretofore sold, and not yet fully paid for, applied towards the payment and extinguishment of the prior liens aforesaid, for which the same were specially pledged, so far as said land and land assets will go for the payment of the same; and after the payment of said prior securities, for which said land and land assets are specially pledged, and the payment of the costs and expenses of administering said prior trusts, respectively, the said last-named trustees, as representing the holders of said consolidated bonds, are entitled to any surplus, if any there should be, from such land and land

assets; and that upon a sale of the road of said defendant and its property under this decree the right to call said prior trustees to account for any such surplus shall pass to the purchaser or purchasers under this decree, or to his or their successor or successors. But this decree shall not, nor shall any right given under it, operate as an incumbrance upon said lands, nor interfere with the trustees of said prior trusts, respectively, in the disposition thereof in accordance with the terms of said several trust deeds; it being the intention to confine the operation thereof merely to the right to call said trustees, respectively, to account, to require the performance by them of their duties as trustees, respectively, and to call upon them, or any of them, for any surplus that may be found in their hands after the provisions of the said several trust deeds shall, respectively, be fully executed." The sale was made to individual purchasers, and confirmed, and a deed executed by the master in chancery conveying all the property of whatsoever kind of the Flint & Pere Marquette Railway Company with the following exception, "Excepting from said sale the lands included in the land grant made by the United States and state of Michigan to aid in the construction of the said Flint & Pere Marquette Railway, and also excepting moneys due or to grow due or heretofore collected from the sale of lands or timber from the lands embraced in said land grant, but including the right to call the land-grant trustees to account, and to demand and receive any surplus after the prior trust shall be satisfied as in said decree provided." The individual purchasers organized the Flint & Pere Marquette Railroad Company, and conveyed the interest purchased by them to that company, to whom the trustees have since accounted for the lands sold by them under their trust. The purchasers at the judicial sale paid $1,000,000 for the property conveyed by the master under the decree of sale and by deed of the master. Part of this purchase price was paid in mortgage bonds, under the usual provision in such cases. The 720 acres here in controversy are still held by the sole surviving trustee, Crapo, for the uses under the deeds of trust, subject to an accounting for the proceeds of the sale of the same to the new railroad company, the Flint & Pere Marquette Railroad Company.

Wm. N. Gordon, for the United States.

Benton Hanchett, for appellees.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge (after stating the facts). We do not think that this case can be distinguished from the case of U. S. v. Winona & St. P. R. Co., 165 U. S. 463, 17 Sup. Ct. 368. In that case the controversy was in regard to lands certified under an act of congress of March 3, 1857 (11 Stat. 195), making a railroad grant to the state of Minnesota in all respects similar to the act of June 3, 1856, here involved. At the time of the passage of the act, the sections in suit were covered by homestead entries and pre-emption filings, and it was contended by the United States, under the decision of the supreme court in Railway Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566, that the grant under the act was in præsenti, and all land entered for homestead or pre-empted at the time of filing the map of definite location was excepted from the grant, and remained public land, although such entries were subsequently, and before the construction of the road, abandoned or canceled. The supreme court, speaking by Mr. Justice Brewer, held that the effect of the acts of March 3, 1887, c. 376 (24 Stat. 556), and of March 2, 1896, c. 39 (29 Stat. 42), if the certification was made after the lands became restored to the public domain, and if the lands had been earned by the railroad company, was to confirm the title to the same in any pur-

chaser in good faith of the lands from the original patentee, the railroad company. Mr. Justice Brewer stated the case before the court as follows:

"These facts appear: First. The railroad company has constructed its road, and has earned the land grant. Second. It has received no more land than congress, by the act referred to, proposed to grant to aid in the construction of the road. Third. At the time that the lands were certified to the state for its benefit, they were not subject to any homestead or pre-emption entry. They were free from all claims other than those of the railroad company itself, and were, except as subject to such claims, in the fullest sense public lands, and within the jurisdiction of the land department. Fourth. Up to March 2, 1885, (when Railway Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566, was decided by this court), the uniform ruling of the land department had been that the title to railroad lands became settled at the time the line of the railroad was surveyed, staked out, and marked on the face of the earth, and not at the time of the filing of the map of definite location in the land department; that a homestead entry, though apparently regular and valid, was open to question by the railroad company, and, if shown to have been fraudulent or irregular in inception, or that it had been abandoned before the right of the company attached, was held not to except the land from the grant; and also that a pre-emption claim existing at the time of the attaching of a railroad grant, if subsequently abandoned, and not consummated,—even though in all respects legal and bona fide,—did not defeat the grant, but upon the failure of such claim the land covered thereby inured to the grant as of the date when it became effective. Fifth. Under such rules of construction, the land in controversy was all properly certified to the state for the benefit of the railroad company. Sixth. The lands were sold and conveyed by the railroad company to parties who paid full value, and bought in good faith, believing the title which the railroad company assumed to convey to be perfect."

There is certainly no distinction between this case and the Winona Case unless we yield to the contention of counsel for the government that the lands here in suit were not sold by the railway company, the original patentee, but were merely conveyed by it in trust, and by way of mortgage, and are excepted from the remedial operation of the acts of 1887 and 1896, upon which the Winona decision rests, by an express proviso in the act of 1887. The act of 1887 was passed for the purpose of adjusting land grants to railroad companies, and restoring to the public domain land improperly certified under such grants, by bills in equity to be filed by the attorney general. The third and fourth sections contain exceptions based on equitable considerations. Section 4 of the act provides, in effect, that title to all lands—with certain exceptions, not here material—which have been erroneously certified or patented to a railroad company in aid of the construction of a railroad, and which have been sold by the grantee company to citizens of the United States, or to persons who have declared their intention to become such citizens, shall be confirmed in such purchasers buying in good faith, upon their making proof of the necessary facts to the secretary of the interior, and patents shall issue to them relating back to the original certification or patenting; but it is expressly provided "that a mortgage or pledge of lands by the company shall not be considered as a sale for the purpose of the act." The act of March 3, 1891, was an act of limitation, providing that all suits to annul a patent should be brought within six years after the issuing of such patent. The act of March 2, 1896, amends the limitation in one respect, but contains further important provi-

sions in respect to bona fide purchasers. The first section contains this clause: "But no patent to any lands held by a bona fide purchaser shall be vacated or annulled, but the right and title of such purchaser is hereby confirmed." The second and third sections provide that any bona fide purchaser of lands erroneously patented or certified may apply to the secretary of the interior prior to the bringing of a suit, and, if it appears that he is a bona fide purchaser, the secretary shall request the suit to be brought against the original patentee for the value of the land, and the title of the claimant shall stand confirmed; but, if the claimant is made a party defendant to the suit, and is found to be a bona fide purchaser, the court shall decree a confirmation of the title in his behalf, and a recovery in behalf of the United States against the original patentee for the value of the land. This act expressly recognizes corporations as entitled to claim as bona fide purchasers under the act. The present bill in equity was filed before the passage of the act of March 2, 1896, but the supreme court, in the Winona Case, held that the act was intended to apply as well to suits then pending under the act of 1887 as to those thereafter brought. The act of 1887 limits the benefits of the fourth section to citizens or persons who have declared their intention to become citizens, and, if we were confined to that act, it might be argued with some force that this refers to a citizenship which only natural persons are capable of acquiring, and so excludes corporations; but we are relieved from this difficulty by the express inclusion of corporations among those who are to share the benefits of the act of 1896. The supreme court has left no doubt as to the meaning of the words "bona fide purchaser" in the act. Mr. Justice Brewer in the Winona Case, speaking of the acts of 1887 and 1896, said:

"Our conclusion is that these acts operate to confirm the title to every purchaser from a railroad company of lands certified or patented to or for its benefit, notwithstanding any mere errors or irregularities in the proceedings of the land department, and notwithstanding the fact that the lands so certified or patented were, by the true construction of the land grants, although within the limits of the grants, excepted from their operation, providing that he purchased in good faith, paid value for the lands, and providing, also, that the lands were public lands in the statutory sense of the term, and free from individual and other claims."

It was thus held that the expression did not have the technical meaning it has in equity, and the opportunity of the purchaser by reference to public records to advise himself, before he bought, of the nullity of the certification, did not strip him of his bona fide character under the act, if, in fact, he believed that the original grantee had a good title. It is a question of some doubt whether the proviso of the act of 1887 excluding mortgagees and pledgees from benefits secured to the class of purchasers in good faith is to be regarded as a limitation of the class of bona fide purchasers protected by the act of 1896. Assuming, without deciding, that the two acts are in pari materia, and that the proviso of the earlier act continues its force in the later, we are of opinion that the defendants the Flint & Pere Marquette Railroad Company and W. W. Crapo, the trustee, are bona fide purchasers of the lands in question under an absolute sale by the Flint & Pere Marquette Railway Company,

the original grantee, and so within the saving of the second and third sections of the act of 1896. The facts,-shortly stated, are that the original grantee, by three deeds conveyed the fee of all the land-grant lands to trustees to secure certain bond issues, with power to sell the lands, and apply the proceeds of sale to the payment of the bonds. This was, so far as the trustees and the bondholders were concerned, and until the lands were sold, only a mortgage or pledge. The equity of redemption in the lands remained in the original grantee of the United States, the railway company. By a subsequent deed the railway company purported to convey to the trustees the equity of redemption in the lands unsold. This, it is contended by counsel for the defendants and appellees, was a sale, because it passed all title to the trustees. We do not think so. The trustees still held the land under the same trusts as under the former deeds. Those trusts were to sell the land, to apply the proceeds to the bonds, and to account for them to the railway company. If the railway company, under the former deeds, had the right, as it had by express provision, to tender the full amount of the indebtedness to the bondholders, and demand a reconveyance of the land unsold from the trustees, the last deed certainly did not extinguish this right. Although it purported to do so, yet no consideration moved to the railway company for such conveyance of the equity of redemption. The bondholders did not release the company from any part of its indebtedness in consideration of the conveyance, and the company expressly retained its right to call the trustees to account for their sales. The last deed was executed merely for the purpose of more completely assuring to the trustees the right and power to sell to third persons the interest of the railway company in the land, so that the latter need not join in the conveyance. It fortified the purchasers from the trustees against the railway company in their fee-simple title, but, as between the trustees and the company, in respect of the equity of redemption in the land unsold, it worked no change at all. It is true that a mortgagee may purchase the equity of redemption from his mortgagor, but courts will view the transaction with suspicion, and will not uphold it when it appears that the consideration was not adequate. Webb v. Rorke, 2 Schoales & L. 661; Ford v. Olden, L. R. 3 Eq. 461. Here, as there was no consideration, the transfer was of no effect, and the equity remained in the old company. The deed we are discussing did not purport to convey the legal title; the trustees already had that. It was only the transfer of the equity; and if, in equity, it did not work the transfer, it was, for such a purpose, as if it had not been made. It needed no action of a court to set it aside, for, as it dealt with an equity, it had no efficacy save in equity, and there it was a nullity. When, therefore, the trustees under the railroad mortgages securing the consolidated bonds filed their bill in foreclosure, the legal title to the lands unsold was in the land trustees, with power of absolute sale to secure the bondholders named in the deeds, and the equity of redemption was in the debtor railway company, with the incidental right to call the trustees to account for their proceedings under the trust. The decree of sale and the master's

deed conveyed to the purchasers all the interest of the defendant railway company in the lands, which interest was described in the decree and deed only as its right to call the trustees to account, but which, of necessity, included its equity of redemption. By the judicial sale, all interest of the defendant railway company was completely devested, and the title passed as absolutely. as where a mortgagor sells the land incumbered by a mortgage or trust to a stranger. The proviso in the act of 1887 excludes mortgagees, but it does not exclude purchasers of the title subject to a mortgage. The purchasers paid $1,000,000 for the property of the old railway company, including its interest in these lands. Because, before the sale, they happened to be, or to represent, bondholders and mortgagees of the old company, and paid part of the $1,000,000 by release of their mortgage debt, they are not the less outright purchasers for value, and not the more to be charged, under the statute of 1896, with knowledge of the defects in the title of the old company. These purchasers transferred their interest in these lands to the new Flint & Pere Marquette Railroad Company. The equitable title of this company in these lands cannot be annulled under the acts of 1887 and 1896.

But it may be argued that the trustee's title to the lands has not been changed by the judicial sale; that he and the bondholders occupy the same position they did before the sale, to wit, that of a mortgagee of the old company, with power of sale; and are thus as much excluded by the proviso of 1887 as before. They derive no title, it is said, through the sale, and therefore cannot strengthen their previous defective title by reason of it. We do not think the proviso of the statute is to be construed so strictly. When the original grantee has parted with all its interests for a valuable consideration, whether by one absolute sale or by a mortgage followed by a conveyance of the equity of redemption, we think the case has been taken out of the proviso, and the mortgagee and grantee are to be regarded as bona fide purchasers, within the meaning of the statute. The reason and justice of the proviso are not very apparent, and it is not the duty of the court to include more in it than its words require. Its language is that "a mortgage or pledge of said lands by the company shall not be considered as a sale for the purpose of this act." This does not mean, if the words are given their natural meaning, that a mortgage and a sale of the equity shall not be so considered. The statute seems to contemplate only two alternative modes of recovery for the government,— one of the fee simple, and the other of the value of the land from the original patentee. It makes no provision for the recovery of the interest of a mortgagee of the original patentee in land after the equity has been purchased by a bona fide purchaser as defined by the statute. The value of such an interest, without special statutory direction, would be difficult to determine, especially in a case like this, where the land is only a part—and probably a small part —of the whole security for the debt. We do not think congress intended a recovery against the mortgagee, but, at the most, only an avoiding of the mortgage. The purchasers at the judicial sale took title subject only to the interest of the bondholders. If that

is void, the purchasers would take the land freed from lien, and the trustee would hold the legal title for them; but the purchaser would be estopped to deny the interest of the bondholders, for it is recited to be a valid and prior interest in the deed and decree under which alone they can claim title. Therefore the mortgage bondholders would acquire an interest through the very sale protected by the statute.

It is suggested that the interest of the purchasers is only an equity at most, and that there is no such thing known as a bona fide purchaser of an equitable interest. Latham v. Barney, 14 Fed. 446. We have referred to the fact that the supreme court has distinctly decided that the words "bona fide purchaser" in this statute are not to have their technical meaning in equity, and the failure to obtain the full legal title would, therefore, not prevent the purchasers of the whole interest in the land from claiming the benefit of the statute. Moreover, in the case at bar the legal title of the trustee would be under the control of the purchasers at the judicial sale if the trust in favor of the bondholders were void; and if, on the other hand, the trust deed and judicial sale are to be regarded together as a parting by the original patentee with the whole interest in the land, and a sale by it within the statute, then the bondholders and the purchasers certainly have the legal title of the trustees in their control, so that they would have no difficulty, on this account, in claiming as bona fide purchasers, even under the strict equity rule. The decree of the circuit court is affirmed.